**FILED**

JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1  Antolin Andrew Marks[1]
   1623 E. J. Street, Suite 5
2  Tacoma, Washington 98421

**CASE RE-ASSIGNED**

3                UNITED STATES DISTRICT COURT         OCT 2 6 2007

4           IN AND FOR THE DISTRICT OF COLUMBIA    TO: SULLIVAN, J. E

5

6                                      :  Case No.:
   Antolin Andrew Marks                :
7                                      :  COMPLAINT   FOR   DAMAGES   AND
              Plaintiff,               :  INJUNCTION  FOR   DENIAL   OF  DUE
8                                      :  PROCESS UNDER THE FIFTH AMENDMENT
   vs                                  :  OF THE UNITED STATES CONSTITUTION
9                                      :
   Gerald Thompson,                    :    Case: 1:07-cv-01026          JURY
10                                     :    Assigned To : Unassigned     ACTION
   Embassy of the Republic of          :    Assign. Date : 6/8/2007
11                                     :    Description: Pro Se Gen. Civil
   Trinidad & Tobago                   :

12     1. This is a suit against Gerald Thompson, a person who is employed

13        by the Republic of Trinidad and Tobago at the Embassy in the

14        United States, District of Washington, D.C.

15     2. It is a suit brought by Antolin Andrew Marks, a person who is a

16        citizen of the United States.

17

18                    **THE FACTS OF IDENTITY**

19     A.  The Plaintiff, after suffering a head injury months earlier,

20         came to know himself in the year 1977.  He awoke at the Los

21         Angeles County General Hospital after being unconscious for

22         some period of time.  Several months before he had been struck

23         by an automobile on the head while cavorting on Santa Monica

24

25  _____

[1] On March 17, 2006 the Plaintiff's name was changed by the Pierce District
Court to Antolin Andrew Marks from Vincent Daniel Hopper.

**RECEIVED**

MAY 0 2 2007

NANCY MAYER WHITTINGTON, CLERK       CHANGE OF ADDRESS - 1
U.S. DISTRICT COURT

1

Boulevard in Hollywood, Calif.  Witnesses later stated that the Plaintiff had been climbing on a Department of Water and Power Pole and had fallen into the street and been hit on the head by an automobile which had kept going.

B.    The Plaintiff had been unconscious for quite some time and when he awoke there was absolutely no memory of the events that had gone before in his life.

C.    The doctors conducted tests for another two months.  They then arranged for the Plaintiff to be released to a Board and Care facility in Hollywood, a place called The Beverlywood Mental Health Clinic in West Hollywood on Beverly Boulevard and Robertson.

D.    When the Plaintiff had been picked up by the ambulance, he had with him several documents of identification:

1.    A birth certificate in the name of Vincent Daniel Hopper.

2.    Another document in the name of Duane Rudder, a welfare document.

3.    Another document, a library card, in the name of Antolin Andrew Marks.

E.    The Los Angeles County General Hospital-USC, for billing purposes, utilized the name with the welfare information which provided the ATP (Ability To Pay).  Thus, the name the Plaintiff had been called by in the hospital was Duane.

F.    When he was transferred to the Board and Care facility, the name was also Duane.

G.    This information was gained by contacting the Los Angeles General Hospital-USC.

H.    The  doctors  at  the  Beverlywood  Mental  Health  Facility identified  only  one  form  of  injury  to  the  Plaintiff  and  that  was  an injury  to  the  brain  stem  that  caused  persistent  amnesia.   Some  of  the doctors  have  stated  that  the  amnesia  could  be  cured  through  regressive therapy.  Although  the  Plaintiff's  medical  condition  was  bad,  he  was beginning  to  remember  his  life,  but  the  fact  that  he  had  been  informed by  the  Mayor's  Office  and  the  Recruiter's  Office  that  he  would  be receiving  about  730   a  month  in  Social  Security  Payments  he  kept  that fact  silent.

I.    Ultimately,  the  doctors  removed  the  Plaintiff  from  the  program and  placed  him  into  another  program  to  allow  them  to  monitor  the Plaintiff.   They  began  to  employ  the  Plaintiff  using  the  CETA  program. Their  intent  was  to  observe  the  Plaintiff  while  providing  income  to allow  for  total  reliance  upon  self.

J.    About  two  months  later  the  Plaintiff  was  allowed  to  leave  the program.

K.    The  Plaintiff  was  then  in  West  Hollywood  which  was  very  close to  the  area  in  Hollywood  where  he  had  been  picked  up  by  the  ambulance. Plaintiff,  sent  to  the  Gay  Community  Services  Center  to  arrange permanent  living  arrangements  for  him,  found  himself  right  back  where he  had  started  on  Santa  Monica  Boulevard  where  the  Gay  Community Services  Center  was  located  on  Highland  and  Santa  Monica  Boulevards. He  went  there.

L.    When  he  arrived  there  he  found  numerous  boys  who  frequented  the Boulevard  and  seemed  to  know  him.   They  believed  that  he  had  died.

They knew of the accident where the Plaintiff had been struck.    They related the details vividly to the Plaintiff.

M.      The boys helped the Plaintiff learn about himself.    He stayed in motels with those boys and realized that he was actually very well known and liked on the Boulevard, and it became apparent that the Plaintiff had been a male prostitute, a practice called hustling, and he a "hustler".

N.      They taught the Plaintiff that he had lived at the commune called, Hudson House[2] run by a man named Pat Rocco.    The house held boys between the ages of 13 through 18.

O.      The house demanded that the boys go to the welfare and apply for benefits in the form of food stamps and cash.

P.      In addition, since the money gained from the initial trip would go directly to the house, the boys alternated identifications to gain more money for their own uses.

Q.      Thus, a single person would be in the records with the same name but never match same characteristics.    The same person could have six cases or more ongoing at the welfare without being caught because of the different identifications.

R.      Most of the funds went directly to the Hudson House.    Pat Rocco, while the Plaintiff was in the hospital, took off with over 2,000,000 in funds to Hawaii.

S.      In addition, the boys gained money through going to the Boulevard and hustling.[3]

---

[2] Hudson House is now moved and is called The United States Mission in Downtown Los Angeles.

T.      From the information provided, the Plaintiff had been on his way back from the Welfare Department when he was struck by the automobile.

U.      During the next few weeks, months, and years, the Plaintiff was saddled with the name, Duane Rudder.   There was specific doubt created, but the doubts were eased by the fact that the Plaintiff knew much about his own heritage, his past and he never used the name for anything other than to receive the checks because, the name was not particularly familiar, and because the people that were there on the Boulevard called the Plaintiff by many different names, "Vin", "Vinnie", "Sunshine", "Roland", "Duane," etc.

V.      Ultimately, Plaintiff met, or rather, re-met the person he knew as Duane Rudder. This person was then a pre-op transsexual and his/her name was then Shauna Davis. In time, Shauna Davis would become a close friend of the Plaintiff. They did travel in the same circles and met much of the same people.

W.      There was also the fact that being on the Boulevard led to continual contact with the Los Angeles Police Department.   As the Plaintiff was arrested by the name, Duane Rudder and the record of the Los Angeles Police Department and the FBI shows that he is, at least one of several persons who has used that name.

X.      Thus, the Plaintiff gained a record with the Los Angeles Police Department showing that he has used that name, Duane Rudder.

---

[3] Male Prostitution.

Y.    The way the law operated on Santa Monica Boulevard is that the police would arrest a hustler and charge him with prostitution. If the arrest was the first arrest, the hustler would be given one day in jail of a five day sentence and be freed. If, however, the arrest was the second time, the hustler would be given thirty days in jail. The third time was sixty days and the fourth time was one hundred and eighty days.

Z.    **Given the fact that the Plaintiff and the other hustlers lived in motels where all their property was held, the rent had to be paid daily. If not, their belongings would be lost. As a direct result, the practice was to give the police a different name every time the police stopped a person. Because it was not necessary to commit a crime of hustling to be stopped, and arrested, every time the police stopped a hustler he gave a different name so that the one day in jail would apply and he could get back to his motel and belongings.**

AA.    As a direct result, the Plaintiff gave numerous names when being met by police officers. Ultimately, most of the names became listed as the Plaintiff's Aliases.

BB.    It should be noted that a person who was arrested and held for more than a day would necessarily lose his belongings as the rent kept piling up while he was in jail.

CC.    At that time in life, to the Plaintiff and the other boys, it was a rather simple choice with absolutely no consequences. Plaintiff and the other boys would be forced to plead guilty on every occasion to get the benefit of release from jail after only one day. Another benefit was the fact that by pleading guilty rather than fighting,

there was no finger-print check by the Police.  This would ensure release.

DD.    In 1981 the Plaintiff began to suffer from blackouts. These periods would be for long and short spans.  The longest time was nine hours when the Plaintiff stood at a wall for nine hours and did not know anything that transpired in between.

EE.    On one occasion the Plaintiff was walking by a pool when he blacked out and fell into the pool.  He awoke three days later in the Los Angeles County General Hospital-USC and was informed by the doctors that they feared there was water damage to the brain.  They provided drugs to the Plaintiff and those drugs were, from time to time, **Lithium, Co-gentin, Listerel, Haldol, Elavil, Topamate, Tegretol, and Mellaril.**

FF.    The drugs were horrible but the Plaintiff was very sedated all the time and it was a horrible experience.

GG.    Increasingly, the Plaintiff found that he needed to take the drugs to feel the same horrible way or he would feel worse.

HH.    In 1982 the Plaintiff went to New York, Connecticut, Rhode Island and Pennsylvania.  He was arrested in Connecticut for passing bad checks.  The judge ordered the Plaintiff to sign up for the United States Armed Forces as part of the conditions of release.

II.    The Plaintiff went to New York and enlisted with the United States Air Force.

JJ.    The Plaintiff was given the AFBT, (Armed Forces Battery of Tests) and passed with a 92 QT.

KK.    Because of the score, the Plaintiff was informed that the Air Force would seek what were called "waivers" because the Plaintiff had been arrested for the prostitution arrests.    They also needed some sort of records from the school the Plaintiff attended.

LL.    Plaintiff did not have any idea of the school records, but was able to provide the records for the Los Angeles Valley College where he had enrolled as Daniel Marc-Roland Cortier.

MM.    As a result of the required wait for the waivers, the Plaintiff had little to do.    He had to fly to California to gain the records from the Los Angeles Valley College and he continued to hustle on Santa Monica Boulevard.

NN.    On some occasions the Plaintiff would hang out at the Crenshaw Recruiter's Office and do some chores.

OO.    On several occasions the Plaintiff was requested to pick up ROTC forms from the High Schools in the Southern Los Angeles area.

PP.    On or about the date of June 25, 1982 the Plaintiff was going to the High School in Los Angeles Pico-Union District when he was shot in the spine by would be robbers who were after the briefcase that held the ROTC forms.

QQ.    The Plaintiff was paralyzed from the waist down for a long period of time.    The Plaintiff was struck by the bullet in the Third Lumbar of the Spinal Column.    The bullet went into the spine and struck the vertebrae.    Over the period of time spent in the hospital, the bullet was surrounded by cartilage and made a functionable part of the spine.

RR.    The Recruiter and Tom Bradley, the Mayor of Los Angeles, visited the Plaintiff in the hospital and appeared on the front page of the Herald Examiner stating that they would help the Plaintiff recover.    A part of this recovery was that they would assist the Plaintiff with Social Security payments.

SS.    When the Plaintiff was released from the hospital after being paralyzed, the doctors actually threw him out of the hospital because he was bringing liability to the hospital by leaving the premises unallowed on the back of a motorcycle driven by his friend, Marc Topalian.

TT.    The doctors gave the Plaintiff pain medication in the form of codeine.  Because he was thrown out before the care was completed, the Plaintiff was offered to go to a Board and Care facility, but refused to do so.    Thus, he was on his own living in Hollywood with his friends from the Boulevard.

UU.    The Plaintiff then gained an apartment found for him by the Recruiter at 1140 North Gower Street in Hollywood.  This was the last contact with the Recruiter who informed the Plaintiff that because of the foreign particle he would not be able to join the forces.

VV.    The codeine replaced the other drugs that had been given by the doctors for the condition of the brain injury.  However, the codeine was very addictive and very depressing.

WW.    The Plaintiff then wrote to the United States Federal Drug Administration and sought information about illicit drugs.  The books they sent led the Plaintiff to become more than curious as the books described the mind enhancing power of certain drugs, and this led to

the Plaintiff to begin using the substances, P.C.P., L.S.D., and Cocaine because all three drugs were noted as being mind enhancing drugs.

XX.    The drug Phencyclidine (PCP) had the effect of killing the pain completely but also had the side effect of showing the Plaintiff his life before the accident that caused his brain injury.  In short, the Plaintiff could see people who were clearly his family, but not know those persons.

YY.    He could see activities that occurred in his life and not know the activities.

ZZ.    He could see who clearly was his parents and this only led to more desolation.  There became a cycle because the Plaintiff would use the drug to maintain sight of the past while killing the pain that continues today.

AAA.    There was another form of pain as well and that was the pain of knowing that somewhere there were relatives and they did not care about the Plaintiff because no person had come to visit the Plaintiff in the hospital when he was unconscious from the automobile striking his head.    No person had filed a missing person's report and, in short, they had not cared about the Plaintiff.

BBB.    Plaintiff suffered the additional pain of watching a lot of people he knew around him dying from the devastation caused by AIDS. Plaintiff, over time, began to know more of himself, but the fact that he was receiving the Social Security Income In the name Wayne Rudder forced him to continue using the name for that purpose only. Better

put, even though the Plaintiff knew that he was not Duane or Wayne Rudder, he continued to use the name to reap the benefits.

CCC. Plaintiff would tirelessly work to earn funds to support his lifestyle. He had regained his ambulation and was now beginning to think about moving away from the streets. He had an income of 630 from Social Security and this enabled him to concentrate less on the rent and more on his future.

DDD. Plaintiff began to work in several banks through Thomas Temporaries, General Electric Telephone Company, CDC Drug Stores, Harris and Frank Clothiers, The Gay Community Services Center. He went to Las Vegas and began to work there also at Continental Light and Graphics, Alias Smith and Jones Restaurant, Ceasar's Palace, Seven Eleven, and then to Connecticut to work at Marx Toys.

EEE. Plaintiff also later entered into several partnerships with people to make businesses:

    A. Goltha Green----Independent Living Lifestyles.

    B. Adolfo Vargas----Cleon's Auto Service.

C. Ruben Soco----Soto's Auto Electric.

D. Louis Young---Broadway Outreach and Resource Development Corporation.

EEE. These partnerships failed to work as the Plaintiff was always deemed a "smoker" due to the fact that he now used crack cocaine rather outlandishly. He was a functional addict to the substance. He made a lot of money and always spent it all on drugs. This would cause his business partners to try and succeed in robbing him of money that he had earned.

FFF.   In everything that the Plaintiff did, he succeeded in doing, but he always had the problem in the head that he wanted to know more about himself and the drugs always provided the route to take him there.

GGG.   During the years 1977 through 1983 the Plaintiff had been picked up by U.S.I.N.S. on several occasions and always released.   It became not a problem, but a hindrance.   There was no seriousness in the fact that the Plaintiff was being picked up by the Service, and, because none of the times resulted in any real injury to a person who was accustomed to spending two days or so in jail, the Plaintiff just ceased to worry about the situation, and only brought it to the front of his mind when the situation arose anew each time.

HHH.   In all, the Plaintiff had been taken to INS on seven different occasions and each time released because of the same very circumstances here.

2

A.   On one occasion, the Plaintiff was in Las Vegas with his friend, Marc Topalian.   Marc knew the real identity of the Plaintiff. Plaintiff was arrested for a traffic ticket gained by his erratic driving.   The arresting agency then released the Plaintiff to the custody of the USINS who prepared an identification card for the Plaintiff in the name of Wayne Ricky Elson Rudder.   This was the first time that the Plaintiff had any identification papers from the USINS.   This prompted Marc Levon-Shant Topalian, the friend of the Plaintiff, to urge the Plaintiff to file an Application for Citizenship using the

Rudder name in order to completely avoid any further encumbrances by the USINS. The application was filed and was paid with by a check from Marc Topalian's account at the First Interstate Bank of California, later purchased by the Security Pacific Bank. On the following weeks other applications were filed using the N-600 form under the real name, Vincent Daniel Hopper. There were never any responses.

B.    The application was filed and the USINS never did anything with the application as far as the Plaintiff knows because they never contacted either Marc or himself.

C.    Immediately afterwards, the Plaintiff then visited the United States Passport Office in West Hollywood. He paid about forty eight dollars in cash and filled out an application for a passport using loose information that was on the birth certificate in his possession when he was taken to the hospital, Vincent Daniel Hopper, but putting the name, Wayne Ruder on the document.

D.    It is believed that the document caused suspicion, and, quite naturally, the fingerprints that were presented came back to the identity that was on file in the police computers, all the aliases that had been given during prostitution arrests.

E.    The United States Secret Service called the Plaintiff into their offices for a conversation and they informed the Plaintiff after he told them the exact same facts that are herein, that there was nothing that he could do. He was "stuck" with the Rudder identity because this is what the police had him listed under, among others. He could not gain a United States Passport.

F.      Plaintiff filed a complaint with the United States Secret Service where he sought that a passport be given.

G.      While in Las Vegas on vacation at Caesar's Palace, Plaintiff was offered a job as a Shill at the Casino. Plaintiff turned down the position and the security ran a random check for warrants and this produced the fact that a warrant had been issued by the Secret Service for the arrest of the Plaintiff.

H.      Plaintiff went to the jail and remained there for three months and was informed to plead guilty by the lawyers. The lawyers then informed the Plaintiff that he would be released on probation.

I.      The Probation Officer was a rather overbearing man named Julian Frankel. This man was a very bad man and sought repeatedly to have sex with the Plaintiff. When the Plaintiff refused his advances, Julian Frankel placed it into the record that the Plaintiff was born in Trinidad. This was absolutely false and this is the first time ever that any person anywhere had ever stated that the Plaintiff was born in Trinidad. Because of the illness of one man, the Plaintiff, since 1984 has been forced to suffer the repeated incursions of his liberties by the USINS and the BICE now.

J.      It must be noted that Julian Frankel had absolutely no information or documentation that would allow him to make such a determination. The Asylum Application before this Court has an Attachment B and that Attachment shows the fact that Julian Frankel was the person who placed that information into the police record. This was to ensure that the Plaintiff would be suspected, forever

more, as being an alien where there was no such evidence to base the statement upon.

K.    Bearing proof to this statement, the record of the probation period for the offense will show that the Probation Officer, Julian Frankel stated to the State Official that the Plaintiff had been in violation on several different occasions for "defrauding the Hilton and Western Union".   The record will show that this too was a lie since there was never a violation of the probation on the federal level.

L.    In 1991 the friend of the Plaintiff, Daniel Crockoft, Vice-President at Lockheed International, was forced to pay a bond of 1,000. for the release of the Plaintiff from the Immigration Department.   This bond was paid and a court date set.   The Plaintiff appeared for two different court dates and then got arrested again.

M.    Upon release from custody in 1992, the Plaintiff was taken into custody by the USINS again.   This time, the USINS decided to increase the bond to 10,000., and they still, to this date, has the 1,000.

N.    Because the money was too much, and because the Plaintiff was undergoing sever problems with his brain injury where he was continually blacking out and having depression, the money, instead of going to bond went to a counsel, Patricia Vargas who received 9,000. in check from Daniel Crockoft, and she later went into the Plaintiff's account at the Community Center and took several checks totaling over 8,000.   she spent some of the checks and when the Social Security began to investigate she returned the others.

O.     This attorney did the work for the case.  She had been paid to establish the identity of the Plaintiff and instead stated that she knew the judge and that the judge would be more apt to grant relief under 212 ( c ) application.  She presented fraudulent documents to the Court and failed.  This is all the subject of a suit filed against the lawyer in federal court, <u>Marks v. Vargas & Associates, No. 94-CV-67 (D.C. Cir.)</u>.  She failed to do the work she was hired to do and actually did work that was not proper and failed to do what was required.  A citizen should never be forced to undergo immigration proceedings.

P.     Plaintiff was so very unhappy and so very depressed about his recurring condition and the state of things that he was sent to St Elizabeth's Hospital in Washington, D.c. to be seen by the psychiatrists.

Q.     Once there, the Plaintiff urged that they undergo the regressive therapy in order to allow him to recapture his memories of his past.  They refused unless they were allowed to do a diagnosis on the Plaintiff.  The last such diagnosis led to the Plaintiff taking a handful of pills a day and not dealing with the root cause of the problems.

R.     While these matters were going on the Plaintiff ceased to take the pills and refused to be diagnosed by the Washington St. Elizabeth's Hospital even though they guaranteed that this would prevent any further action in the deportation proceeding.  It was the understanding of the Plaintiff that he would be allowed to live at the hospital and be allowed out at the discretion of the hospital and

1  eventually be released totally into the community as a patient.  The

2  Plaintiff did not want the stigma of mental conditions attached to his

3  life.

4  S.    The Plaintiff had filed several actions in the District Courts

5  dealing with this situation.    One of the matters was about his

6  citizenship.  The other matter was about the fact that the U.S.I.N.S.

7  had been paid for an application for citizenship papers and failed to

8  do anything about the application despite taking the money long before

9  the occasion of proceedings.  There were two other matters as well.

10  T.    The Plaintiff was housed at several different facilities

11  throughout the United States while in that custody for about nine

12  months.    As a result, the Plaintiff was able to see the depraved

13  conditions that were existing at those places.    As a result, the

14  Plaintiff filed suit against the US.I.N.S. on behalf of the Chinese

15  who were being housed 23 persons in a 56 square foot area.  They were

16  promptly moved.

17  U.    The Plaintiff filed suit on behalf of the Sikh Indians who had

18  been held by the U.S.I.N.S. for up to eight years since they could not

19  be repatriated to India.    The suit was taken over by a Legal Firm

20  called CARECEN and ultimately won providing that all the Sikh Indians

21  would be freed.

22  V.    Plaintiff filed suit on behalf of the Hispanics who were being

23  denied equal protection by agents who sat along the roadside and

24  pulled over cars that had more than two Hispanics within and forced

25  those persons to go to custody to prove they were citizens or

nationals.  This suit was taken over by CARACEN and was won.

W.      The Plaintiff filed suit against the U.S.I.N.S. on behalf of Black people who were given bonds of 30,000 to 80,000 when they were charged with possession of cocaine for personal use, while Hispanics were given bonds of 1,500; 500., and while Blacks were being deported instead of being given voluntary departure while Hispanics were given voluntary departure when their charges were for selling cocaine. The Service immediately reduced the bonds of all Blacks to 1,000 and they were all freed.

X.      The actions of the Plaintiff attracted the attention of the Immigration Judge. She was angered when the Plaintiff made a letter about one particular detainee who had received a 500. bond and had substantial amount of cocaine that he was selling and the Plaintiff was at 10,000 for five dollars worth of cocaine that he was smoking. These things angered the Judge and any chance that Patricia Vargas had evaporated due to the things that the Plaintiff was doing.

Y.      When the Plaintiff filed suit on behalf of the Black Immigration officers stating that they were being discriminated against, the Regional Director was fired due to the published reports quoted from the suit. The suit was taken over by the Union for the officers and they ultimately prevailed.

Z.      Plaintiff makes no apologies for his actions but fully expected that his antics outside of the courtroom would be kept outside the spectrum of the immigration proceeding. This was not possible and the Immigration Judge ruled against the application made by Patricia Vargas wherein she swore that the Plaintiff was dying from AIDS and other things.

AA.    The Plaintiff filed an Appeal and the Appeal was upheld by the Board of Immigration Appeals.  Plaintiff is unaware of what the appeal contained as he was, at the time, heavily medicated for the depression and the blackouts.

BB.    There came a time when the Plaintiff stopped taking all the medications at the Hospital.  He just stopped taking the medicines. He was helped by a doctor of the hospital to just stop taking the medications and to do some exercises that seemed to prevent the blackouts.  It got to a point that the Plaintiff knew, with certainty, when the blackouts was going to come.  The pain would come first and would then lead to moments of unconsciousness.  Tests continued to be run by the doctors but there was no conclusive action done in order to perfect the regressive therapy.

CC.    The Plaintiff then became more personally active  in his cause. He filed actions with the United States District Court for the Central District of California seeking to declare his citizenship.  He filed actions with the Washington D.C. Court.  He filed action with the Ninth Circuit Court of Appeals and with the Washington D.C. Court of Appeals.  These matters were pending.

DD.    The Government argued to the Ninth Circuit that they would allow the Plaintiff to litigate his matters using the United States Embassy in Trinidad.  The Ninth Circuit found no prejudice as the Government stated that the citizenship matters would be litigated and the Plaintiff would be given a fair hearing.

EE.    The Supreme Court also found the exact same thing.  Sandra Day O'Connor stated, "The Plaintiffs argue that the Plaintiff would be

able to litigate the matter of his citizenship using the United States Embassy in Trinidad, apparently a common enough occurrence. There is no prejudice in denying a stay of the deportation."

FF.    On the date of 12-9-93 the Plaintiff was removed to the country of Trinidad and Tobago.

GG.    On the date of 12-10-93 the United States Government moved to dismiss all the pending matters based upon lack of jurisdiction. The Plaintiff was not given any notice of this fact and the matters were dismissed.

HH.    These then became the facts of that were discussed with the Trinidad Government.

II.    The Trinidad Government allowed the Plaintiff to embark on the trip to the United States on January 8, 1994. The only requirement was that the Plaintiff have a ticket to leave. This ticket was sent by Daniel Crockoft, the Plaintiff's friend.

JJ.    The Plaintiff immediately was allowed into the country by informing the Customs Agency in Miami Airport of his citizenship in the United States and provided his Drivers' License.

KK.    Plaintiff then contacted the United States Attorney who informed the Plaintiff that there was no need to contact him because the matters had been dismissed.

LL.    From that time to the present, August 18, 2005, the Plaintiff has lived his life freely in the United States.

MM.    Plaintiff has come into contact with the law on several occasions, and the United States B.I.C.E. has not exercised any option

1    to detain him even though they were made fully aware that the

2    Plaintiff was in custody.

3    NN.    On or about February 22, 2005 the Plaintiff was made aware that

4    the BICE had placed a detainer on his person.

5    OO.    On the date of August 18, 2005, the Plaintiff was picked up by

6    BICE officers and continues to be held at NWDC.

7                                    **TIMELINESS**

8        **Although this suit is brought in 2007, some 13 years after the**

9    **event, the Plaintiff avers that he has just discovered the identity of**

10   **the person who actually provided the documents. This discovery came in**

11   **the year 2006 when he received documents from the State Department**

12   **identifying Gerald Thompson by name.**

13       **The Plaintiff has sought documents from the Trinidad Embassy in**

14   **order to gain more insight into the inner workings of the decision**

15   **makers who made the decision to provide a document to the United**

16   **States Immigration and Naturalization Services.**

17       **This suit is timely as it is brought within one year of discovery**

18   **of the facts leading to the suit.**

19                             **REASONS FOR THIS SUIT**

20       This suit is brought because it is the belief that the

21   Defendants, Gerald Thompson and the Trinidad Embassy denied him due

22   process in their presentation of a document that would allow the

23   Plaintiff to be sent to Trinidad in the first place.

24       The suit is brought because Gerald Thompson failed to contact the

25   Plaintiff, failed to ascertain whether the Plaintiff was or was not a

1  Trinidad citizen before he provided a document that would result in
2  the removal of an American citizen to the Trinidad Country.

3      This suit is brought because the Plaintiff is now again in the
4  very same position where he could be subject to further denials of due
5  process by the Defendants.

6      The suit is brought because Exhibit B states, "Wayne Ricky Elison
7  Rudder has stated to me that he/she is a citizen of Trinidad and
8  Tobago and that I have no reason to doubt this statement", and **this is**
9  **absolutely false because the Plaintiff was never contacted by anyone**
10 **from the Trinidad Embassy in 1993. He never spoke to Gerald Thompson**
11 **or anyone from that Embassy. He did not communicate in writing to**
12 **anyone from that Embassy and he did not know of the arrangements for**
13 **his departure until the very date of the flight.**

14     This suit is brought because the Plaintiff is a citizen of the
15 United States, and although he was gratefully assisted by the Trinidad
16 Government when he was sent there for 29 days, the Plaintiff must
17 bring this suit to protect his rights.

18     For the reasons that go before, the Plaintiff seeks that the
19 Court hold a jury trial on this matter and award an amount of damages
20 in this action, 22,000. Plaintiff also seeks an injunction that the
21 Trinidad Embassy provide all documents from the decision making
22 process in 1993, from both the Embassy and from the Trinidad
23 Government, to the Plaintiff if those documents are still in
24 existence.

25 Submitted under the penalty of perjury on the date of 4-19-07

1 | Antolin Andrew Marks

2

3

4 | **EXHIBITS**

5 | **EXHIBIT A is the letter that was sent to the Trinidad Embassy.**

6 | **EXHIBIT B is the document that was sent from the Embassy to the USINS**

7 | **where it bears the signature of Gerald Thompson.**

8 | **Exhibit C is the letter written by Gerald Thompson where he provided**

9 | **the documents to the United States Immigration and Naturalization**

10 | **Service and did not first contact the Plaintiff to learn if the**

11 | **Plaintiff was a citizen of Trinidad.**

12 | **Exhibit D is Rudder's Immigrant Visa Application. Pertinent here**

13 | **is the picture of Rudder at the age of 14.**

14 | **Exhibit E is Plaintiff's pictures and those pictures show that**

15 | **the only similarity of the Plaintiff to Rudder is that they are both**

16 | **Black.**

17 | **Exhibit F is the Birth Certificate of the Plaintiff showing that**

18 | **he was born in the City of Lynwood, County of Los Angeles, State of**

19 | **California, United States of America.**

20

21

22

23

24

25

1

2

3                                PROOF OF SERVICE

4                                      &

5                                 **DECLARATION**

6   I, Antolin Andrew Marks, AVER THAT I AM  A PARTY TO THIS ACTION
    DO HEREBY AVER THAT I HAVE PROVIDED A COPY OF THE FOREGOING
7   DOCUMENT:

8   **COMPLAINT FOR DAMAGES AND INJUNCTION**

9   **Guy Benjamin**
    **Trinidad Embassy**
10  **1708 Massachusetts Avenue N.W.**
    **Washington, D.C. 20036**
11

12

13  THE ITEMS WERE MAILED FIRST CLASS MAIL ON THE DATE BELOW.

14

15  SUBMITTED ON 4-20-07

16

17  Antolin Andrew Marks

18

19  _____

20

21

22

23

24

25

# EXHIBIT COVER PAGE

# EXHIBIT  _____

**U.S. Department of Justice**

Immigration and Naturalization Service

INS/PHS Evaluation Center
St. Elizabeth's Hospital
2700 Martin Luther King Ave. SE
Washington, D. C. 20032-2602

November 15, 1993

Mr. Herman Brown
Consular Section
Embassy of Trinidad and Tobago
1708 Massachusetts Ave., N. W.
Washington, D. C. 20036

|  |  |
|---|---|
| I&NS Number: | A34 316 600 |
| Name of Detainee: | Wayne Ricky Elison RUDDER |
| Date of Birth: | March 20, 1960 |
| Subject: | Travel Document for TRINIDAD |

Dear Mr. Brown:

Thank you for discussing the case of Wayne Ricky Elison RUDDER on the telephone on November 12, 1993. I have put together a package of material from Rudder's Immigration records to assist you in establishing his identity and nationality. Copies of his records are attached for your information.

Please review the attached documents for Rudder and issue a travel document for his return to Trinidad.

Thank you in advance for your help.

Sincerely,

*R. E. Curtis, Jr.*

Richard E. Curtis, Jr.
Officer-in-Charge
Telephone: (202) 373-7779, 7780

Attachments:

    Four photos of detainee
    Birth Certificate
    Immigrant Visa and Alien Registration
    F.B.I. Criminal Rap Sheet
    INS Form I-221S  Order to Show Cause
    Immigration Judge's Decision
    Decision of the Board of Immigration Appeals

07 1026

**FILED**

JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# EXHIBIT COVER PAGE

# EXHIBIT ___B___

EC No. 172 93

TRINIDAD AND TOBAGO

GOVERNMENT PRINTERY, TRINIDAD.
TRINIDAD AND TOBAGO
1985

## EMERGENCY CERTIFICATE

68

ISSUED TO:

Miss
Mrs.
Mr.   Wayne Ricky Elton Rudder

07 1026
**FILED**

JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

365

L-283-PU

161

**PHOTOGRAPH OF BEARER**



.......................................
*Signature of bearer*

Summary of the statements made by this holder in proof of his/her Trinidad and Tobago citizenship, and documents produced in support of his/her statements.

Trinidad Tobago Passport No. 314551
issued 18/2/74 VERIFIED

Place of Birth ........ Trinidad ....................

Date of Birth ....... 20 March 1960 .............

Holder is accompanied by:

.......................................
.......................................
.......................................

**EMERGENCY CERTIFICATE**

This is to certify that

Wayne Ricky Elison Rudder

has stated to me that he/she is a citizen of Trinidad and Tobago and that I have no reason to doubt this statement.

This certificate is valid only for the journey to

...... Trinidad Tobago ......

leaving ....... U.S.A .......

on or about November - December 1993

for ....... Trinidad .......................... and must be surrendered to the Immigration Officer at the place of arrival

NOV 19 1993

*Gerald Thompson*
Signature of Issuing Authority
AMBASSADOR

69

**PHOTOGRAPH OF BEARER**



..............................................
*Signature of bearer*

Summary of the statements made by this holder in proof of his/her Trinidad and Tobago citizenship, and documents produced in support of his/her statements.

TRINIDAD & TOBAGO PASSPORT No. 314551 .....

ISSUED 18/2/74, VERIFIED .....

Place of Birth .... TRINIDAD .....

Date of Birth .... 20 MARCH, 1960 .....

Holder is accompanied by:

..............................................
..............................................
..............................................

**EMERGENCY CERTIFICATE**

This is to certify that

WAYNE RICKY ELISON RUDDER .....

has stated to me that he/she is a citizen of Trinidad and Tobago and that I have no reason to doubt this statement.

This certificate is valid only for the journey to

TRINIDAD & TOBAGO .....

leaving .... U.S.A .....

on or about NOVEMBER - DECEMBER 1993

for .... TRINIDAD .... and must be surrendered to the Immigration Officer at the

*[stamp: EMBASSY OF THE REPUBLIC OF TRINIDAD AND TOBAGO NOV. 19 1993 WASHINGTON]*

*Gerald Thompson*
Signature of Issuing Authority
~ AMBASSADOR

71

3c8

L-28C-P71   164

# EXHIBIT COVER PAGE

# EXHIBIT 



## EMBASSY OF THE REPUBLIC OF TRINIDAD AND TOBAGO

TEL:   (202) 467-6490
FAX:   (202) 785-3130

1708, MASSACHUSETTS AVENUE, N.
WASHINGTON D.C. 200⌐

CON: 3/8/1

November 22, 1993

Immigration  and Naturalization Service
INS/PHS Evaluation Center
St. Elizabeth's Hospital
2700 Martin Luther King Ave., S.E.
Washington D.C.   20032-2602

#### RE. Wayne Ricky Elison RUDDER
A34 316 600

67

Dear Sir/Madam:

The enclosed Emergency Certificate will facilitate travel to Trinidad for the above mentioned deportee.

Kindly notify this Embassy about the travel arrangement for his departure.

*Gerald Thompson*
Ambassador

07 1026
FILED

JUN - 8 2007      304

Encloures

HB/lr

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

L-285-PT/     158

# EXHIBIT COVER PAGE

# EXHIBIT _____

IV 4316600

# UNITED STATES OF AMERICA
# IMMIGRANT VISA AND ALIEN REGISTRATION

THE IMMIGRANT
☐ HAS ☒ HAS NOT
BEEN PREVIOUSLY IN
THE UNITED STATES

I & NS FILE NUMBER, IF KNOWN

| OF: | (Family Name) RUDDER | (First Name) Wayne | (Middle Name) Ricky Elison |
|---|---|---|---|

ACTION BY IMMIGRANT INSPECTOR

THE IMMIGRANT NAMED ABOVE ARRIVED IN THE UNITED STATES VIA

PA 232      3/7/74

*(Name of vessel or flight no. of arrival)*

INELIGIBILITY FOR VISA WAIVED UNDER SECTION
☐ 212(e)   ☐ 212(h)
☐ 212(g)   ☐ 212(i)

SEC. 212(a) (14) LABOR CERTIFICATION
☐ NOT APPLICABLE
☐ STATUTORILY EXEMPT
☐ ATTACHED
☒ NOT REQUIRED

IR-2
A-34316600

| MO.-DAY-YR. OF BIRTH 03/20/60 | COUNTRY OF BIRTH Trinidad | OCCUPATION Student | COUNTRY OF LAST RESIDENCE Trinidad | MARITAL STATUS ☐ M ☐ S ☐ W ☐ D ☐ SEP | SEX ☒ M ☐ F | NATIONALITY Trinidadian |

| FINAL ADDRESS IN THE UNITED STATES | STREET ADDRESS 91 Atlantic Street | CITY, STATE AND ZIP CODE, IF AVAILABLE Stamford, Conn. 06901 |

| ACTION OF S.I.O. | ACTION ON APPEAL | U.S.P.H.S. |

EXHIBIT No. 2
JAN
*(Date)*

This visa is issued under Section 221 of the Immigration and Nationality Act, and upon the basis of the facts stated in the application. Possession of a visa does not entitle the bearer to enter the United States if at the time he seeks to enter he is found to be inadmissible. Upon arrival in the United States, it must be surrendered to a United States Immigration Officer.

AMERICAN Embassy

AT Port of Spain, Trinidad, W.I.

Vice Consul of the United States of America.

## IMMIGRANT CLASSIFICATION

CLASSIFICATION SYMBOL
IR-2

FOREIGN STATE/OTHER AREA LIMITATION

IMMIGRANT VISA NO.

| ISSUED ON | (Day) 4 | (Month) March | (Year) 1974 |
|---|---|---|---|

THE VALIDITY OF THIS VISA EXPIRES MIDNIGHT AT THE END OF

| (Day) 3 | (Month) July | (Year) 1974 |

## PASSPORT

NO. 314851

OR OTHER TRAVEL DOCUMENTS (Describe)

| ISSUED TO | Wayne Ricky Elison RUDDER |
| BY | Passport Office Trinidad |
| ON | February 18, 1974 |
| EXPIRES | February 18, 1979 |

PHOTOGRAPH ATTACHED
FOREIGN SERVICE
OF THE UNITED STATES OF AMERICA

Tariff Item No. 21
Fee Paid $20
Local Cy. Equiv. $40.00

FORM 12-68 FS-511

☆ U.S. GOVERNMENT PRINTING OFFICE

07-1026
FILED
JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# EXHIBIT COVER PAGE

# EXHIBIT _____





**FILED**

JUN - 8 2007    R-17-P7/

07 1026

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# EXHIBIT COVER PAGE

# EXHIBIT 




# COUNTY OF LOS ANGELES•REGISTRAR-RECORDER/COUNTY CLERK

**CERTIFICATE OF LIVE BIRTH**
STATE OF CALIFORNIA — DEPARTMENT OF PUBLIC HEALTH

STATE FILE NUMBER

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER **7055**

**45858**

| | | | |
|---|---|---|---|
| **THIS CHILD** | 1a. NAME OF CHILD—FIRST NAME **Vincent** | 1b. MIDDLE NAME **Daniel** | 1c. LAST NAME **Hopper** |
| | 2. SEX **Male** | 3a. THIS BIRTH SINGLE, TWIN OR TRIPLET **Single** | 3b. IF TWIN OR TRIPLET, THIS CHILD BORN 1ST, 2ND, 3RD | 4a. DATE OF BIRTH—MONTH, DAY, YEAR **August 27, 1960** | 4e. HOUR **8:52 P** |
| **PLACE OF BIRTH** | 5a. PLACE OF BIRTH—NAME OF HOSPITAL **St. Francis Hospital** | 5b. STREET ADDRESS (GIVE STREET OR RURAL ADDRESS OR LOCATION. DO NOT USE P. O. BOX NUMBERS) **3630 Imperial Highway** | |
| | 5c. CITY OR TOWN **Lynwood** | 5d. COUNTY **Los Angeles** | |
| **MOTHER OF CHILD** | 6. MAIDEN NAME OF MOTHER—FIRST NAME **Julia** | MIDDLE NAME **Mae** | 6. LAST NAME **Williamson** | 7. COLOR OR RACE OF MOTHER **Negro** |
| | 8. AGE OF MOTHER (AT TIME OF THIS BIRTH) **26** YEARS | 9. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **Illinois** | 10. MAILING ADDRESS OF MOTHER IF DIFFERENT FROM USUAL RESIDENCE—FOR NOTIFICATION OF BIRTH |
| **USUAL RESIDENCE OF MOTHER** (WHERE DOES MOTHER LIVE?) | 11a. USUAL RESIDENCE OF MOTHER—STREET ADDRESS OR RURAL ADDRESS OR LOCATION **1512 Visalia** | 11b. IF INSIDE CORPORATE LIMITS ☒CHECK HERE | IF OUTSIDE CITY CORPORATE LIMITS CHECK ONE: ☐ ON A FARM ☐ NOT ON A FARM |
| | 11c. CITY OR TOWN **Compton** | 11d. COUNTY **Los Angeles** | 11e. STATE **California** |
| **FATHER OF CHILD** | 12a. NAME OF FATHER—FIRST NAME **James** | 12b. MIDDLE NAME **Wilder** | 12c. LAST NAME **Hopper** | 13. COLOR OR RACE OF FATHER **White** |
| | 14. AGE OF FATHER (AT TIME OF THIS BIRTH) **36** YEARS | 15. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **Illinois** | PRESENT OR LAST OCCUPATION **Salesman** | 16a. KIND OF INDUSTRY OR BUSINESS **Automotive Equip .** |
| **INFORMANT'S CERTIFICATION** | I HAVE REVIEWED THE ABOVE STATED INFORMATION AND HEREBY CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | 17a. PARENT OR OTHER INFORMANT—SIGNATURE | 17b. DATE SIGNED BY INFORMANT **August 29, 1960** |
| **ATTENDANT'S CERTIFICATION** | I HEREBY CERTIFY THAT I ATTENDED THIS BIRTH AND THAT THE CHILD WAS BORN ALIVE AT THE HOUR, DATE AND PLACE STATED ABOVE. | 18a. PHYSICIAN—SIGNATURE _Gilbert J. Hill, M.D._ —OR OTHER—DEGREE OR TITLE | 18a. ADDRESS _Lynwood Calif_ |
| **REGISTRAR'S CERTIFICATION** | 19. DATE ON WHICH NAME ADDED BY SUPPLEMENTAL NAME REPORT | 20. LOCAL REGISTRAR—SIGNATURE | 21. DATE RECEIVED BY LOCAL REGISTRAR **SEP 14 1960** |

Filed **OCT 7 1960** RAY E. LEE, COUNTY RECORDER

07 1026
**FILED**

JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk. **MAR 0 2 2000**



**CONNY B. McCORMACK**
Registrar-Recorder/County Clerk

This copy not valid unless prepared on engraved border displaying Seal and Signature of the Registrar-Recorder County Clerk.

*19-0010800*



SEAL OF THE STATE OF CALIFORNIA • EUREKA

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE