Antolin Andrew Marks[1]
1623 E. J. Street, Suite 5
Tacoma, Washington 98421

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF COLUMBIA

Antolin Andrew Marks

         Plaintiff,

vs

Gerald Thompson
Herman Brown
and the,
Embassy of the Republic of
Trinidad & Tobago

         : Case No.: **07-1026(UN A)**
         :
         : **FIRST AMENDED** COMPLAINT FOR
         : **DAMAGES AND INJUNCTION FOR DENIAL**
         : **OF DUE PROCESS UNDER THE FIFTH**
         : **AMENDMENT OF THE UNITED STATES**
         : **CONSTITUTION**
         : **For 224,000. IN DAMAGES**
         :
         : **JURY TRIAL DEMANDED**
         :
         :

1. This is a suit against Gerald Thompson and Herman Brown, persons who are employed by the Republic of Trinidad and Tobago at the Embassy in the United States, District of Washington, D.C.

2. It is a suit brought by Antolin Andrew Marks, a person who is a citizen of the United States.

**TIMELINESS**

    **Although this suit is brought in 2007, some 13 years after the event, the Plaintiff avers that he has just discovered the identity of the persons who actually provided the documents. This discovery came in the year 2006 when he received documents from the State Department identifying Gerald Thompson by name.**

---

[1] On March 17, 2006 the Plaintiff's name was changed by the Pierce District Court to Antolin Andrew Marks from Vincent Daniel Hopper.

1    The Plaintiff has sought documents from the Trinidad Embassy in

2    order to gain more insight into the inner workings of the decision

3    makers who made the decision to provide a document to the United

4    States Immigration and Naturalization Services.

5    This suit is timely as it is brought within one year of discovery

6    of the facts leading to the suit.

7    **REASONS FOR THIS SUIT**

8    This suit is brought because it is the belief that the

9    Defendants, Gerald Thompson, Herman Brown

10    and the Trinidad Embassy denied him due process in their presentation

11    of a document that would allow the Plaintiff to be sent to Trinidad in

12    the first place.

13    The suit is brought because Gerald Thompson failed to contact the

14    Plaintiff, failed to ascertain whether the Plaintiff was or was not a

15    Trinidad citizen before he provided a document that would result in

16    the removal of an American citizen to the Trinidad Country.

17    This suit is brought because the Plaintiff is now again in the

18    very same position where he could be subject to further denials of due

19    process by the Defendants.

20    The suit is brought because Exhibit B states, "Wayne Ricky Elison

21    Rudder has stated to me that he/she is a citizen of Trinidad and

22    Tobago and that I have no reason to doubt this statement", and **this is**

23    **absolutely false because the Plaintiff was never contacted by anyone**

24    **from the Trinidad Embassy in 1993. He never spoke to Gerald Thompson**

25    **or anyone from that Embassy. He did not communicate in writing to**

1    anyone from that Embassy and he did not know of the arrangements for
2    his departure until the very date of the flight.

3        This suit is brought because the Plaintiff is a citizen of the
4    United States, and although he was gratefully assisted by the Trinidad
5    Government when he was sent there for 29 days, the Plaintiff must
6    bring this suit to protect his rights as the actions of Gerald
7    Thompson has created a situation where the Plaintiff is certain that
8    the consequences leading from the denial of due process could
9    precipitate further denials of due process.

10       Further, the Plaintiff specifically claims that it is the
11   practice of the United States Government to bribe consulates to gain
12   documents so the Plaintiff could be affected again in the future.

13                                    CLAIMS

14   1. Plaintiff claims that Gerald Thompson's provision of a document
15       to the United States Immigration Services that allowed the
16       removal of the Plaintiff from the country of his birth to
17       Trinidad, a place he was not born in was a denial of due process
18       under the Fifth Amendment.

19   2. The Plaintiff claims that Gerald Thompson's failure to contact
20       the Plaintiff prior to submitting a document to the United States
21       Immigration Service was a denial of due process.

22   3. Plaintiff claims that he was harmed by the actions of Gerald
23       Thompson.

24   4. Plaintiff never spoke to Gerald Thompson and never informed any member
25       of the Trinidad Government/Embassy that he was a citizen of the Country

of Trinidad and Gerald Thompson lied in his statement on Exhibit B where he stated, "Wayne Ricky Elson Rudder has stated to me that he is a citizen of Trinidad and Tobago and I have no reason to doubt this statement."

## THE UNCHANGEABLE FACTS OF THE PLAINTIFF'S IDENTITY

A. The Plaintiff is an American Citizen who was born in the City of Lynwood, County of Los Angeles, State of California.

B. Plaintiff was born to the Mothering of Julie Hopper whose rightful name is Julia. His father is James Wilder Hopper.

C. He lived with the family until he was thirteen. During the ages of about 7 through thirteen he was routinely molested by his father until such became known to the family.

D. The Department of Social Services came to the home and removed the Plaintiff from the home. He lived in several foster homes for brief periods for a time and then began running around Hollywood while alternatively living at his mother's home.

E. He ultimately moved to a room in his father's new residence in Hollywood at 5165 Fountain Avenue, Apartment 125 and lived there and on the streets of Hollywood until he moved to 5757 Franklin Avenue in Hollywood, Apartment 212. This was because he was no longer welcome at his mother's home.

F.  During the years from 13 through 17 the Plaintiff lived in Hollywood and was a male prostitute there.

G.  The life of Hollywood was different, a different culture and the Plaintiff fit into that culture.

H.  Plaintiff traveled routinely from Los Angeles to San Francisco, from Los Angeles to Las Vegas, from Los Angeles to New York, from Los Angeles to Greenwich, Connecticut, and took cross country trips all over the United States. In every place he found persons he could ply his trade with and was very successful and then disaster struck. He was hit by an automobile on the head causing him to be taken to the hospital in Los Angeles at the height of his success.

I.  The Plaintiff awoke at the Los Angeles County General Hospital after being unconscious for some period of time. Several months before he had been struck by an automobile on the head while cavorting on Santa Monica Boulevard in Hollywood, Calif. Witnesses later stated that the Plaintiff had been climbing on a Department of Water and Power Pole and had fallen into the street and been hit on the head by an automobile which had kept going.

J.  The Plaintiff had been unconscious for quite some time and when he awoke there was absolutely no memory of the events that had gone before in his life.

K.    The doctors conducted tests for another two months.  They then arranged for the Plaintiff to be released to a Board and Care facility in Hollywood, a place called The Beverlywood Mental Health Clinic in West Hollywood on Beverly Boulevard and Robertson.

L.    At the time the Plaintiff was struck by the automobile, he had been living at a commune where there were about twenty-one other hustlers.[2]

M.    The house was run by a fellow named Pat Rocco and the scheme of the four houses at Hudson and Yucca was that a person could remain in the house as long as he visited Welfare each month and gained the 88 dollars in food stamps that was provided.  These funds were provided directly to the house. However, it did not end there as the boys were required to interchange identification cards which did not include a picture at that time, and use those cards to gain more benefits from the welfare department. Thus, a single person could receive aid on six or so more occasions during the month and never be caught.

N.    It was also true that persons there would use fictitious names most of the time. It was a learned experience and a passage of rite.

_____

[2] Male Prostitutes

O.   When the Plaintiff had been picked up by the ambulance, he had with him several documents of identification:

    1.   A birth certificate in the name of Vincent Daniel Hopper.

    2.   Another document in the name of Duane Rudder, a welfare document.

    3.   Another document, a library card, in the name of Antolin Andrew Marks.

P.   The Los Angeles County General Hospital-USC, for billing purposes, utilized the name with the welfare information which provided the ATP (Ability To Pay). This meant that the hospital could be certain that it would be paid by the County of Los Angeles for the hospitalization   Thus, the name the Plaintiff had been called by in the hospital was Duane.

Q.   When he was transferred to the Board and Care facility, the name was also Duane.

R.   This information was gained by contacting the Los Angeles General Hospital-USC.

S.   It is doubtful, in any case, given the condition of the Plaintiff at the time, that he would have been able to give his true name because of the unconsciousness coupled with the amnesia that followed.

T.    The doctors at the Beverlywood Mental Health Facility identified only one form of injury to the Plaintiff and that was an injury to the brain stem that caused persistent amnesia. Some of the doctors have stated that the amnesia could be cured through regressive therapy.

U.    Plaintiff was kept in treatment at the Center for months. Ultimately, the doctors removed the Plaintiff from one program and placed him into another program to allow them to monitor the Plaintiff.    They began to employ the Plaintiff using the CETA program.    Their intent was to observe the Plaintiff while providing income to allow for total reliance upon self.

V.    About two months later the Plaintiff was allowed to leave the program and was directed to the Gay And Lesbian Communtiy Center in Los Angeles.

W.    The Plaintiff was then in West Hollywood which was very close to the area in Hollywood where he had been picked up by the ambulance.    Plaintiff, sent to the Gay Community Services Center to arrange permanent living arrangements for him, found himself right back where he had started on Santa Monica Boulevard where the Gay Community Services Center was located on Highland and Santa Monica Boulevards. He went there.

X.    When he arrived there he found numerous boys who frequented the Boulevard and seemed to know him.    They believed that he had died.    They knew of the accident where the Plaintiff

had been struck.    They related the details vividly to the Plaintiff.

Y.    The Plaintiff had difficulty remembering everything in his past. The boys helped the Plaintiff learn about himself.    He stayed in motels with those boys and realized that he was actually very well known and liked on the Boulevard, and it became apparent that the Plaintiff had been a male prostitute, a practice called hustling, and he a "hustler".

Z.    They taught the Plaintiff that he had lived at the commune called, Hudson House[3] run by a man named Pat Rocco.    The house held boys between the ages of 13 through 18.

AA.    The house demanded that the boys go to the welfare and apply for benefits in the form of food stamps and cash.

BB.    In addition, since the money gained from the initial trip would go directly to the house, the boys alternated identifications to gain more money for their own uses.

CC.    Thus, a single person would be in the records with the same name but never match same characteristics.    The same person could have six cases or more ongoing at the welfare without being caught because of the different identifications.

---

[3] Hudson House is now moved and is called The United States Mission in Downtown Los Angeles.

DD.    Most of the funds went directly to the Hudson House.  Pat Rocco, while the Plaintiff was in the hospital, took off with over 2,000,000 in funds to Hawaii.

EE.    In addition, the boys gained money through going to the Boulevard and hustling.

FF.    From the information provided, the Plaintiff had been on his way back from the Welfare Department when he was struck by the automobile.

GG.    During the next few weeks, months, and years, the Plaintiff was saddled with the name, Duane Rudder in the official records of the hospital, but the Plaintiff never used the name Duane Rudder for anything else because he knew his name was Vincent Daniel Hopper, a name that he did not like either. People that were there on the Boulevard called the Plaintiff by many different names, "Vin", "Vinnie", "Sunshine", "Roland", "Duane," etc.

HH.    There was also the fact that being on the Boulevard led to continual contact with the Los Angeles Police Department.  As the Plaintiff was arrested by the name, Duane Rudder and the record of the Los Angeles Police Department and the FBI shows that he is just one of several persons who has used that name.

II.    Thus, the Plaintiff gained a record with the Los Angeles Police Department showing that he has used that name, Duane Rudder.

JJ.    The way the law operated on Santa Monica Boulevard is that the police would arrest a hustler and charge him with prostitution.    If the arrest was the first arrest, the hustler would be given one day in jail of a five day sentence and be freed.    If, however, the arrest was the second time, the hustler would be given thirty days in jail.    The third time was sixty days and the fourth time was one hundred and eighty days.

KK.    **Given the fact that the Plaintiff and the other hustlers lived in motels where all their property was held, the rent had to be paid daily.  If not, their belongings would be lost.  As a direct result, the practice was to give the police a different name every time the police stopped a person.  Because it was not necessary to commit a crime of hustling to be stopped, and arrested, every time the police stopped a hustler he gave a different name so that the one day in jail would apply and he could get back to his motel and belongings.**

LL.    As a direct result, the Plaintiff gave numerous names when being met by police officers. Giving the different names meant that he would only spend one day in jail each time he got arrested for prostitution. Ultimately, most of the names became listed as the Plaintiff's Aliases.

MM.    It should be noted that a person who was arrested and held for more than a day would necessarily lose his belongings as the rent kept piling up while he was in jail.

NN.   At that time in life, to the Plaintiff and the other boys, it was a rather simple choice with absolutely no consequences. Plaintiff and the other boys would be forced to plead guilty on every occasion to get the benefit of release from jail after only one day.   Another benefit was the fact that by pleading guilty rather than fighting, there was no finger-print check by the Police.  This would ensure release.

OO.   In 1981 the Plaintiff began to suffer from blackouts. These periods would be for long and short spans.   The longest time was nine hours when the Plaintiff stood at a wall for nine hours and did not know anything that transpired in between.

PP.   On one occasion the Plaintiff was walking by a pool when he blacked out and fell into the pool.   He awoke three days later in the Los Angeles County General Hospital-USC and was informed by the doctors that they feared there was water damage to the brain.

QQ.   Plaintiff, being extremely attractive, traveled in the circles of the very attractive gayboys of Hollywood.  They traveled extensively and made money all over the United States.

RR.   In 1982 the Plaintiff went to New York, Connecticut, Rhode Island and Pennsylvania.   He was arrested in Connecticut for passing bad checks.   The judge ordered the Plaintiff to sign up for the United States Armed Forces as part of the conditions of release.

SS.    The Plaintiff went to New York and enlisted with the United States Air Force.

TT.    The Plaintiff was given the AFBT, (Armed Forces Battery of Tests) and passed with a 92 QT.

UU.    Because of the score, the Plaintiff was informed that the Air Force would seek what were called "waivers" because the Plaintiff had been arrested for the prostitution arrests.    They also needed some sort of records from the school the Plaintiff attended.

VV.    Plaintiff could not gain the older school records, but was able to provide the records for the Los Angeles Valley College where he had enrolled as Daniel Marc-Roland Cortier.

WW.    As a result of the required wait for the waivers, the Plaintiff had little to do.    He had to fly to California to gain the records from the Los Angeles Valley College and he continued to hustle on Santa Monica Boulevard.

XX.    On some occasions the Plaintiff would hang out at the Crenshaw Recruiter's Office and do some chores.

YY.    On several occasions the Plaintiff was requested to pick up ROTC forms from the High Schools in the Southern Los Angeles area.

ZZ.    On or about the date of June 25, 1982 the Plaintiff was going to the High School in Los Angeles Pico-Union District when

he was shot in the spine by would be robbers who were after the briefcase that held the ROTC forms.

AAA.   The Plaintiff was paralyzed from the waist down for a long period of time.   The Plaintiff was struck by the bullet in the Third Lumbar of the Spinal Column.   The bullet went into the spine and struck the vertebrae.   Over the period of time spent in the hospital, the bullet was surrounded by cartilage and made a functionable part of the spine.

BBB.   The Recruiter and Tom Bradley, the Mayor of Los Angeles, visited the Plaintiff in the hospital and appeared on the front page of the Herald Examiner stating that they would help the Plaintiff recover.   A part of this recovery was that they would assist the Plaintiff with Social Security payments.

CCC.   When the Plaintiff was released from the hospital after being paralyzed, the doctors actually threw him out of the hospital because he was bringing liability to the hospital by leaving the premises unallowed on the back of a motorcycle driven by his friend, Marc Topalian.

DDD.   The doctors gave the Plaintiff pain medication in the form of codeine.   Because he was thrown out before the care was completed, the Plaintiff was offered to go to a Board and Care facility, but refused to do so.   Thus, he was on his own living in Hollywood with his friends from the Boulevard.

EEE.   The Plaintiff then gained an apartment found for him by the Recruiter at 1140 North Gower Street in Hollywood.  This was the last contact with the Recruiter who informed the Plaintiff that because of the foreign particle he would not be able to join the forces.

FFF.   The codeine replaced the other drugs that had been given by the doctors for the condition of the brain injury.  However, the codeine was very addictive and very depressing.

GGG.   The Plaintiff then wrote to the United States Federal Drug Administration and sought information about illicit drugs.  The books they sent led the Plaintiff to become more than curious as the books described the mind enhancing power of certain drugs, and this led to the Plaintiff to begin using the substances, P.C.P., L.S.D., and Cocaine because all three drugs were noted as being mind enhancing drugs.

HHH.   The drug Phencyclidine (PCP) had the effect of killing the pain completely but also had the side effect of showing the Plaintiff his life before the accident that caused his brain injury.   In short, the Plaintiff could see people who were clearly his family, but not know those persons.

III.   He could see activities that occurred in his life and not know the activities.

JJJ.   He could see who clearly was his parents and this only led to more desolation.   There became a cycle because the Plaintiff

would use the drug to maintain sight of the past while killing the pain that continues today.

KKK.   There was another form of pain as well and that was the pain of knowing that somewhere there were relatives and they did not care about the Plaintiff because no person had come to visit the Plaintiff in the hospital when he was unconscious from the automobile striking his head.   No person had filed a missing person's report and, in short, they had not cared about the Plaintiff.

LLL.   Plaintiff suffered the additional pain of watching a lot of people he knew around him dying from the devastation caused by AIDS. Plaintiff, over time, began to know more of himself, but the fact that he was receiving the Social Security Income In the name Wayne Rudder forced him to continue using the name for that purpose only. Better put, even though the Plaintiff knew that he was not Duane or Wayne Rudder, he continued to use the name to reap the financial and medical benefits.

MMM.   Plaintiff would tirelessly work to earn funds to support his lifestyle.   He had slowly regained his ambulation and was now beginning to think about moving away from the streets.   He had an income of 630 from Social Security and this enabled him to concentrate less on the rent and more on his future.

NNN.   Plaintiff began to work in several banks through Thomas Temporaries, General Electric Telephone Company, CDC Drug

Stores, Harris and Frank Clothiers, The Gay Community Services Center. He went to Las Vegas and began to work there also at Continental Light and Graphics, Alias Smith and Jones Restaurant, Ceasar's Palace, Seven Eleven, and then to Connecticut to work at Marx Toys, all in his differing identities.

OOO. Plaintiff also later entered into several partnerships with people to make businesses:

A. Goltha Green----Independent Living Lifestyles.

B. Adolfo Vargas----Cleon's Auto Service.

C. Ruben Soco----Soto's Auto Electric.

D. Louis Young---Broadway Outreach and Resource Development Corporation.

FFF. In everything that the Plaintiff did, he succeeded in doing, but he always had the problem in the head that he wanted to know more about himself and the drugs always provided the route to take him there.

GGG. During the years 1977 through 1983 the Plaintiff had been picked up by U.S.I.N.S. on several occasions and always released. It became not a problem, but a hindrance. There was no seriousness in the fact that the Plaintiff was being picked up by the Service, and, because none of the times resulted in any real injury to a person who was accustomed to spending two days or so in jail, the Plaintiff just ceased to worry about the

situation, and only brought it to the front of his mind when the

situation arose anew each time.

HHH.    In all, the Plaintiff had been taken to INS on seven

different occasions and each time released because of the same

very circumstances here.

                                2

A.    On one occasion, the Plaintiff was in Las Vegas with his

        friend, Marc Topalian.    Marc knew the real identity of

        the Plaintiff.    Plaintiff was arrested for a traffic

        ticket gained by his erratic driving.    The arresting

        agency then released the Plaintiff to the custody of the

        USINS who prepared an identification card for the

        Plaintiff in the name of Wayne Ricky Elson Rudder.    This

        was the first time that the Plaintiff had any

        identification papers from the USINS.    This prompted Marc

        Levon-Shant Topalian, the friend of the Plaintiff, to

        urge the Plaintiff to file an Application for Citizenship

        using the Rudder name in order to completely avoid any

        further encumbrances by the USINS.    The application was

        filed and was paid with by a check from Marc Topalian's

        account at the First Interstate Bank of California, later

        purchased by the Security Pacific Bank. On the following

        weeks other applications were filed using the N-600 form

under the real name, Vincent Daniel Hopper. There were never any responses.

B. The application was filed and the USINS never did anything with the application as far as the Plaintiff knows because they never contacted either Marc or himself.

C. Immediately afterwards, the Plaintiff then visited the United States Passport Office in West Hollywood. He paid about forty eight dollars in cash and filled out an application for a passport using loose information that was on the birth certificate in his possession when he was taken to the hospital, Vincent Daniel Hopper, but putting the name, Wayne Ruder on the document.

D. It is believed that the document caused suspicion, and, quite naturally, the fingerprints that were presented came back to the identity that was on file in the police computers, all the aliases that had been given during prostitution arrests.

E. The United States Secret Service called the Plaintiff into their offices for a conversation and they informed the Plaintiff after he told them the exact same facts that are herein, that there was nothing that he could do. He was "stuck" with the Rudder identity because this is

what the police had him listed under, among others. He could not gain a United States Passport.

F.  As the Plaintiff was legally ignorant, he did not realize that he could have actually appealed the decision by asserting the truth of the matter and he did not realize that it would affect his gaining a passport under his own true name.

G.  Plaintiff filed a complaint with the United States Secret Service where he sought that a passport be given.

H.  While in Las Vegas on vacation at Caesar's Palace, Plaintiff was offered a job as a Shill at the Casino. Plaintiff turned down the position and the security ran a random check for warrants and this produced the fact that a warrant had been issued by the Secret Service for the arrest of the Plaintiff.

I.  Plaintiff went to the jail and remained there for three months and was informed to plead guilty by the lawyers. The lawyers then informed the Plaintiff that he would be released on probation.

J.  The Probation Officer was a rather overbearing man named Julian Frankel. This man was a very bad man and sought repeatedly to have sex with the Plaintiff. When the Plaintiff refused his advances, Julian Frankel placed it into the record that the Plaintiff was born in Trinidad.

This was absolutely false and this is the first time ever that any person anywhere had ever stated that the Plaintiff was born in Trinidad. Because of the illness of one man, the Plaintiff, since 1984 has been forced to suffer the repeated incursions of his liberties by the USINS and the BICE now.

K.    It must be noted that Julian Frankel had absolutely no information or documentation that would allow him to make such a determination. The Asylum Application before this Court has an Attachment B and that Attachment shows the fact that Julian Frankel was the person who placed that information into the police record. This was to ensure that the Plaintiff would be suspected, forever more, as being an alien where there was no such evidence to base the statement upon.

L.    Bearing proof to this statement, the record of the probation period for the offense will show that the Probation Officer, Julian Frankel stated to the State Official that the Plaintiff had been in violation on several different occasions for "defrauding the Hilton and Western Union". The record will show that this too was a lie since there was never a violation of the probation on the federal level.

M.  In 1991 the friend of the Plaintiff, Daniel Crockoft, Vice-President at Lockheed International, was forced to pay a bond of 1,000. for the release of the Plaintiff from the Immigration Department. This bond was paid and a court date set. The Plaintiff appeared for two different court dates and then got arrested again.

N.  Upon release from custody in 1992, the Plaintiff was taken into custody by the USINS again. This time, the USINS decided to increase the bond to 10,000., and they still, to this date, has the 1,000.

O.  Because the money was too much, and because the Plaintiff was undergoing sever problems with his brain injury where he was continually blacking out and having depression, the money, instead of going to bond went to a counsel, Patricia Vargas who received 9,000. in funds from Daniel Crockoft, and she later went into the Plaintiff's account at the Community Center and took several checks totaling over 8,000. She spent some of the checks and when the Social Security began to investigate and alerted the Plaintiff that the checks were being cashed.

P.  Upon being informed of the facts of his checks being cashed, the Plaintiff demanded that Vargas return the money and the checks. He alerted Social Security and she was forced to return the bulk of the checks. However, the

1    relationship was never the same between the counsel and

2    the Plaintiff.

3    Q.   The relationship between the lawyer and the Plaintiff

4         became very strained and there was no trust in the

5         relationship.

6    R.   This attorney did some work for the case.  She had been

7         paid to establish the identity of the Plaintiff and

8         instead stated that she knew the judge and that the judge

9         would be more apt to grant relief under 212 ( c )

10        application.  She presented fraudulent documents to the

11        Court and failed.  Plaintiff was aware of her actions and

12        allowed her to pursue her actions. In sum, he aided and

13        abetted the attorney. This is all the subject of a suit

14        filed against the lawyer in federal court, (Marks/Rudder

15        v. Vargas & Associates, No. 94-CV-67 (D.C. Cir.) She

16        failed to do the work she was hired to do and actually

17        did work that was not proper and failed to do what was

18        required.

19

20   S.   Plaintiff was so very unhappy and so very depressed about

21        conditions of confinement where the Agency had taken to

22        moving the Plaintiff all over the United States to

23        frustrate the jurisdiction of the District Courts. He

24        told a psychiatrist that he was depressed and this led to

25

another move to Washington D.C., a hospital named St. Elizabeth's Hospital.

T.  Once there, the Plaintiff urged that they undergo the regressive therapy in order to allow him to recapture his memories of his past.  They refused unless they were allowed to do a diagnosis on the Plaintiff.  Plaintiff refused any diagnosis.

U.  While these matters were going on the Plaintiff ceased to take the pills and refused to be diagnosed by the Washington St. Elizabeth's Hospital even though they guaranteed that this would prevent any further action in the deportation proceeding.  It was the understanding of the Plaintiff that he would be allowed to live at the hospital and be allowed out at the discretion of the hospital and eventually be released totally into the community as a patient.  The Plaintiff did not want the stigma of mental conditions attached to his life.

V.  The Plaintiff had filed several actions in the District Courts dealing with this situation.  One of the matters was about his citizenship.  The other matter was about the fact that the U.S.I.N.S. had been paid for an application for citizenship papers and failed to do anything about the application despite taking the money

long before the occasion of proceedings.  There were two other matters as well.

W.  The Plaintiff was housed at several different facilities throughout the United States while in that custody for about nine months.  As a result, the Plaintiff was able to see the depraved conditions that were existing at those places.  As a result, the Plaintiff filed suit against the US.I.N.S. on behalf of the Chinese who were being housed 23 persons in a 56 square foot area.  They were promptly moved.

X.  The Plaintiff filed suit on behalf of the Sikh Indians who had been held by the U.S.INS. for up to eight years since they could not be repatriated to India.  The suit was taken over by a Legal Firm  called CARECEN and ultimately won providing that all the Sikh Indians would be freed.

Y.  Plaintiff filed suit on behalf of the Hispanics who were being denied equal protection by agents who sat along the roadside and pulled over cars that had more than two Hispanics within and forced those persons to go to custody to prove they were citizens or nationals.  This suit was taken over by CARACEN and was won.

Z.  The Plaintiff filed suit against the U.S.INS. on behalf of Black people who were given bonds of 30,000  to 80,000

when they were charged with possession of cocaine for personal use, while Hispanics were given bonds of 1,500; 500., and while Blacks were being deported instead of being given voluntary departure while Hispanics were given voluntary departure when their charges were for selling cocaine. The Service immediately reduced the bonds of all Blacks to 1,000 and they were all freed.

AA.  The actions of the Plaintiff attracted the attention of the Immigration Judge. She was angered when the Plaintiff made a letter about one particular detainee who had received a 500. bond and had substantial amount of cocaine that he was selling and the Plaintiff was at 10,000 for five dollars worth of cocaine that he was smoking. These things angered the Judge and any chance that Patricia Vargas had evaporated due to the things that the Plaintiff was doing.

BB.  When the Plaintiff filed suit on behalf of the Black Immigration officers stating that they were being discriminated against, the Regional Director was fired due to the published reports quoted from the suit. The suit was taken over by the Union for the officers and they ultimately prevailed.

CC.  Plaintiff makes no apologies for his actions but fully expected that his antics outside of the courtroom would

be kept outside the spectrum of the immigration proceeding. This was not possible and the Immigration Judge ruled against the application made by Patricia Vargas wherein she swore that the Plaintiff was dying from AIDS and other things.

DD. The Plaintiff filed an Appeal and the Appeal was upheld by the Board of Immigration Appeals. Plaintiff is unaware of what the appeal contained as he was, at the time, heavily medicated for the depression and the blackouts.

EE. There came a time when the Plaintiff stopped taking all the medications at the Hospital. He just stopped taking the medicines. He was helped by a doctor of the hospital to just stop taking the medications and to do some exercises that seemed to prevent the blackouts. It got to a point that the Plaintiff knew, with certainty, when the blackouts was going to come. The pain would come first and would then lead to moments of unconsciousness. Tests continued to be run by the doctors but there was no conclusive action done in order to perfect the regressive therapy.

FF. The Plaintiff then became more personally active in his cause. He filed actions with the United States District Court for the Central District of California seeking to

1    declare his citizenship. He filed actions with the

2    Washington D.C. Court. He filed action with the Ninth

3    Circuit Court of Appeals and with the Washington D.C.

4    Court of Appeals. These matters were pending.

5    GG. The Government argued to the Ninth Circuit that they

6        would allow the Plaintiff to litigate his matters using

7        the United States Embassy in Trinidad. The Ninth Circuit

8        found no prejudice as the Government stated that the

9        citizenship matters would be litigated and the Plaintiff

10       would be given a fair hearing.

11   HH. The Ninth Circuit found, "The Plaintiffs argue that the

12       Plaintiff would be able to litigate the matter of his

13       citizenship using the United States Embassy in Trinidad,

14       apparently a common enough occurrence. There is no

15       prejudice in denying a stay of the deportation." This was

16       on December 8, 1993. Plaintiff fully intended to seek

17       rehearing of any decision by the Ninth Circuit and then

18       to seek Supreme Court review, but was denied the

19       opportunity to do so.

20

21   II. On the date of 12-9-93 the Plaintiff was removed to the

22       country of Trinidad and Tobago.

23   JJ. On or about the date of 12-10-93 the United States

24       Government moved to dismiss all the pending matters based

25

upon lack of jurisdiction. The Plaintiff was not given any notice of this fact and the matters were dismissed.

KK. These then became the facts of that were discussed with the Trinidad Government.

LL. The Trinidad Government, working in conjunction with the American Embassy in Trinidad, allowed the Plaintiff to embark on the trip to the United States on January 8, 1994. The only requirement was that the Plaintiff have a ticket to leave. This ticket was sent by Daniel Crockoft, the Plaintiff's friend.

MM. The Plaintiff immediately was allowed into the country by informing the Customs Agency in Miami Airport of his citizenship in the United States and provided his Drivers' License.

NN. Plaintiff then contacted the United States Attorney who informed the Plaintiff that there was no need to contact him because the matters had been dismissed.

OO. Plaintiff was not aware that he could simply move for reopening of the matters and believed the odyssey to be over.

PP. From that time to the present, August 18, 2005, the Plaintiff has lived his life freely in the United States.

QQ. Plaintiff has come into contact with the law on several occasions, and the United States B.I.C.E. has not

exercised any option to detain him even though they were made fully aware that the Plaintiff was in custody.

RR. On or about February 22, 2005 the Plaintiff was made aware that the BICE had placed a detainer on his person.

SS. On the date of August 18, 2005, the Plaintiff was picked up by BICE officers and continues to be held at NWDC.

TT. After arrival at the Northwest Detention Center, the Plaintiff informed the ICE that he was a citizen. He gave them all his particulars regarding his birth in California and his parents. Initially, the form that was given to the Plaintiff did not reflect the absolute need for complete information such as proper mother's name and the Plaintiff answered the questions commonly such as Mother's name; Julie Hopper instead of Julia Hopper and Father's name: Hop Hopper instead of James Wilder Hopper and this was because the Plaintiff commonly calls his mother Julie and his father Hop.

UU. The Plaintiff went to the court and immediately sought that a lawyer be granted in his case because he had spoken to the only lawyer on the list given by the EOIR and that group, Northwest Immigration Rights Project stated that by their charter they could not help persons convicted of a crime.

VV. The Judge stated that she did not have the authority to grant counsel and the statutes prevented her from granting counsel.

WW. Plaintiff tried to contact other persons as counsel but was unable to do so because of the restrictive telephones.

XX. Plaintiff also did get ahold of two counsels but they would not discuss the case on the telephone lines because the calls were not confidential.

YY. On March 6, 2006 the Plaintiff, after contacting the Los Angeles County Recorder's Office, gained a copy of his Birth Certificate. The County Recorder sent two copies.

ZZ. ICE seized the copies as soon as they arrived in the mail and ICE refused to allow the Plaintiff to submit them to the District Court or to the Passport Office to allow the Plaintiff to seek a passport which he desired to do in order to provide primary proof of citizenship.

AAA. ICE then looted the Plaintiff's documents and illegally took documents that had been subpoenaed from the Los Angeles County Probation Office and the Los Angeles Federal public Defender and used those documents for their own purposes.

BBB. Plaintiff then, on March 8, 2006 submitted subpoenas to ICE in the case 05-1812 RSL MAT in the Seattle District

Court and sought that the birth certificates be presented to the Plaintiff.

CCC. ICE refused to provide the documents and the District Court failed to command that the subpoenas be upheld.

DDD. On the date of March 14, 2006 ICE engineered a closing of the immigration case and released the Plaintiff to Pierce County Sheriff for extradition to California.

EEE. No detainer was filed with Pierce County by ICE.

FFF. When the Plaintiff successfully challenged the extradition eighteen days later, ICE picked up the Plaintiff and brought him back into custody of ICE.

GGG. There was no warrant, no new detainer, no new Notice to Appear.

HHH. The Immigration Judge issued warrants but they were not responded to. The Plaintiff sought that the Immigration Judge use the regulations to cause the District Court to enforce the subpoenas and the Immigration Judge stated that she had sent the information to the United States Attorney, nothing was ever done.

III. During the hearing that occurred the Plaintiff completely established that the fingerprints do not identify the name a person was born with. Despite the Service's use of Plaintiff's fingerprints to attempt to portray that the fingerprints identify the name a person was born with.

JJJ. During the hearing the Plaintiff established that the person who now calls himself Vin Daniel Hooper is a person who was born Darryl Yates and now receives social security under the Plaintiff's name as Darryl Yates appeared in response to the issuance of a subpoena naming him as Darryl Yates.

KKK. Plaintiff established the fact that Darryl Yates has never used the entire name, Vincent Daniel Hopper and has used only variations of that name, much as the Plaintiff has.

LLL. Plaintiff established the fact that his 1993 testimony was made solely to avoid the twenty years in jail for fraud that was then problematic for the Plaintiff.

MMM. Plaintiff established the fact that he is Vincent Daniel Hopper, a citizen of the United States, or, at the very least, created sufficient doubt to make any finding unclear and unconvincing.

NNN. Plaintiff clearly rebutted all the Government's evidence and showed that he is clearly not an alien and not subject to removal from the United States.

OOO. Plaintiff is a person who was born Vincent Daniel Hopper and a person who was born in the United States. The service has nothing that contradicts that central premise.

PPP. On the date of March 14, 2006 the Pierce County District Court issued an order changing the Plaintiff's name from Vincent Daniel Hopper to Antolin Andrew Marks.

QQQ. The Social Security Administration has issued a change in numbers from 572 45 5432 to 624 23- 0187.

RRR. Plaintiff's California Driver's License is issued in Antolin Andrew Marks A 5746694.

SSS. Plaintiff's taxes are submitted in his new identity Antolin Andrew Marks.

TTT. Plaintiff has submitted applications to the United States Citizen and Immigration Services seeking a Certificate of Identity under N 600 and they have not responded.

UUU. He submitted an Application for Certificate of Identity to the USCIS in 2006 and that was denied and he appealed in a timely fashion to the Administrative Appeals Unit and that has not been responded to in over a year.

VVV. Plaintiff also submitted Freedom of Information Act Requests to the USCIS to gain evidence to use in the hearings but those requests have not been honored. In fact, the Plaintiff was not even provided a complete copy of Rudder's file so that he could challenge the Agency's determination.

WWW. Plaintiff also submitted an N-600 in Rudder's behalf as Rudder is also a citizen but USCIS has failed to respond to that application.

XXX. Plaintiff has subpoenaed information from the Armed Forces to prove his citizenship but those subpoenas has never been responded to and never enforced.

YYY. Plaintiff has subpoenaed information from the Los Angeles School District to prove his identity but the District charges money for that information and the Plaintiff is indigent.

ZZZ. Plaintiff has attempted to contact witnesses to appear on his behalf but he has been unable to do so because he requires counsel to serve subpoenas upon his parents and to enforce those subpoenas.

AAAA.  In 1993 the Plaintiff was denied due process by the INS who removed him without due process because the Ninth Circuit Order on December 8, 1993 denying a stay was not final. The Columbia Circuit's Order on December 6, 1993 denying a stay was not final. The BIA had just issued an order on December 8, 1993 indicating that the Plaintiff should file a motion for reconsideration with the application to waive fees. Further, the District Court citizenship matters were pending. None of the matters were final.

BBBB.   Plaintiff believes that he was a victim of malicious persecution where the Service stated to the Ninth Circuit that the Plaintiff would be allowed to litigate his matters through the United States Embassy in Trinidad and then dismissed the matters for lack of juridiction without any notice to the Plaintiff.

CCCC. Plaintiff believes that all the facts of this case shows that he has been denied due process in the hearing today and the hearing in 1993.

DDDD. Finally, in 1993 the Plaintiff did not regard the administrative agency hearing as being definitive. He did not believe that the District Court would allow him to be deported once he stated that he was a citizen. The Plaintiff acknowledges taking actions in the past which clearly casts doubt on his credibility, but, no credibility or not, he is an American without credibility. He was born in the United States. Plaintiff has made mistakes, sure, but he has sought to correct this major mistake. His mistake in testifying as he did in 1993 has been shown and he has corrected that mistake. He testified that way solely because he was under threat of indictment for fraud which would have given him up to twenty years in jail. Now, the record is clear and the statute of limitations has run on the fraud charges. In

fact, the issue with the 27,000 has been cleared up with the SSA. Now, the Plaintiff wants to go on with his life in a way that he is not bothered by anyone else. He wants to mature into his life and continue with his plan to become self sufficient once more, legally, and to live his life out in peace. He must, however, do so in the land of his birth, the United States of America.      For the reasons that go before, the Plaintiff seeks that the Court hold a jury trial on this matter and award an amount of damages in this action, 224,000. Plaintiff also seeks an injunction that the Trinidad Embassy provide all documents from the decision making process in 1993, from both the Embassy and from the Trinidad Government, to the Plaintiff if those documents are still in existence.

Submitted under the penalty of perjury on the date of 4-30-07

6-11-07

Antolin Andrew Marks

**EXHIBITS**

1

2 **EXHIBIT A is the letter that was sent to the Trinidad Embassy.**

3 **EXHIBIT B is the document that was sent from the Embassy to the USINS**

4 **where it bears the signature of Gerald Thompson.**

5 **Exhibit C is the letter written by Gerald Thompson where he provided**

6 **the documents to the United States Immigration and Naturalization**

7 **Service and did not first contact the Plaintiff to learn if the**

8 **Plaintiff was a citizen of Trinidad.**

9       **Exhibit D is Rudder's Immigrant Visa Application. Pertinent here**

10 **is the picture of Rudder at the age of 14.**

11       **Exhibit E is Plaintiff's pictures and those pictures show that**

12 **the only similarity of the Plaintiff to Rudder is that they are both**

13 **Black.**

14       **Exhibit F is the Birth Certificate of the Plaintiff showing that**

15 **he was born in the City of Lynwood, County of Los Angeles, State of**

16 **California, United States of America.**

    EEEE.

17

18 Submitted on the date of 5-1-07      6 -//-07

19

20 Antolin Andrew Marks

21

22

23

24

25

1

**PROOF OF SERVICE**

2

&

3

**DECLARATION**

4

I, Antolin Andrew Marks, A PARTY TO THIS ACTION DO HEREBY AVER THAT I HAVE

5

PROVIDED A COPY OF THE FOREGOING DOCUMENT

6

       **FIRST AMENDED COMPLAINT**

7

8

Guy Benjamin
Immigration Officer
Embassy of the Trinidad and Tobago Country

9

1708 Massachusetts Avenue N.W.
Washington, D.C. 20036

10

11

I WILL TESTIFY UNDER THE PENALTY OF PERJURY THAT THIS IS THE TRUTH.

12

THE ITEMS WERE MAILED FIRST CLASS MAIL ON THE DATE BELOW.

13

14

SUBMITTED ON 4-30-07                6-11-07

15

Antolin Andrew Marks

16

17

18

19

20

21

22

23

24

25

**FIRST AMENDED COMPLAINT - 39**

1                                    **EXHIBITS**

2  **EXHIBIT A is the letter that was sent to the Trinidad Embassy.**

3  **EXHIBIT B is the document that was sent from the Embassy to the USINS**

4  **where it bears the signature of Gerald Thompson.**

5  **Exhibit C is the letter written by Gerald Thompson where he provided**

6  **the documents to the United States Immigration and Naturalization**

7  **Service and did not first contact the Plaintiff to learn if the**

8  ````````````````````````````**Plaintiff was a citizen of Trinidad.**

9          **Exhibit D is Rudder's Immigrant Visa Application. Pertinent here**

10  **is the picture of Rudder at the age of 14.**

11          **Exhibit E is Plaintiff's pictures and those pictures show that**

12  **the only similarity of the Plaintiff to Rudder is that they are both**

13  **Black.**

14          **Exhibit F is the Birth Certificate of the Plaintiff showing that**

15  **he was born in the City of Lynwood, County of Los Angeles, State of**

16  **California, United States of America.**

17

18

19

20

21

22

23

24

25

# EXHIBIT COVER PAGE

# EXHIBIT _____



**U.S. Department of Justice**

Immigration and Naturalization Service

INS/PHS Evaluation Center
St. Elizabeth's Hospital
2700 Martin Luther King  Ave. SE
Washington, D. C.  20032-2602

November 15, 1993

Mr. Herman Brown
Consular Section
Embassy of Trinidad and Tobago
1708 Massachusetts Ave., N. W.
Washington, D. C.  20036

I&NS Number:    A34 316 600
Name of Detainee:  Wayne Ricky Elison RUDDER
Date of Birth:    March 20, 1960
Subject:    Travel Document for TRINIDAD

Dear Mr. Brown:

Thank you for discussing the case of **Wayne Ricky Elison RUDDER** on
the telephone on November 12, 1993.  I have put together a package
of material from Rudder's Immigration records to assist you in
establishing his identity and nationality.  Copies of his records
are attached for your information.

Please review the attached documents for Rudder and issue a travel
document for his return to Trinidad.

Thank you in advance for your help.

Sincerely,

*R. E. Curtis, Jr.*

Richard E. Curtis, Jr.
Officer-in-Charge
Telephone: (202) 373-7779, 7780

Attachments:

   Four photos of detainee
   Birth Certificate
   Immigrant Visa and Alien Registration
   F.B.I. Criminal Rap Sheet
   INS Form I-221S  Order to Show Cause
   Immigration Judge's Decision
   Decision of the Board of Immigration Appeals

# EXHIBIT COVER PAGE

# EXHIBIT  _____



EC No. 172 93

TRINIDAD AND TOBAGO



GOVERNMENT PRINTERY, TRINIDAD,
TRINIDAD AND TOBAGO
1985

# EMERGENCY CERTIFICATE

6r

ISSUED TO:

| Miss | |
| Mrs. | |
| Mr. | WAYNE RICKY ELTON PHILDER |

L-283-PU

305

161

PHOTOGRAPH OF BEARER



.......................................................
*Signature of bearer*

Summary of the statements made by this holder in proof of his/her Trinidad and Tobago citizenship, and documents produced in support of his/her statements.

Trinidad Tobago Passport No. B1485 1
Issued 18/2/74, Verified
Place of Birth Trinidad
Date of Birth 20 March 1960
Holder is accompanied by:

.......................................................
.......................................................
.......................................................

## EMERGENCY CERTIFICATE

This is to certify that

Wayne Ricky Elison Rudder
has stated to me that he/she is a citizen of Trinidad and Tobago and that I have no reason to doubt this statement.

This certificate is valid only for the journey to

Trinidad Tobago

leaving U.S.A

on or about November - December 1993

for Trinidad and must be surrendered to the Immigration Officer at the place of arrival.

NOV 19 1993

EMBASSY OF THE REPUBLIC OF TRINIDAD AND TOBAGO
WASHINGTON

*Signature of Issuing Authority*
AMBASSADOR

69

366

L-282-PTI

162



EC No. 112 93

TRINIDAD AND TOBAGO

GOVERNMENT PRINTERY, TRINIDAD,
TRINIDAD AND TOBAGO
1985

## EMERGENCY CERTIFICATE

ISSUED TO:     70

| Miss | |
| Mrs. | |
| Mr. | Wayne Ricky Elison Pundor |

3 17

L-281-P71

163

PHOTOGRAPH OF BEARER



..........................................
*Signature of bearer*

Summary of the statements made by this holder in proof of his/her Trinidad and Tobago citizenship, and documents produced in support of his/her statements.

Trinidad & Tobago Passport No. 314051

Issued 18/2/74 VERIFIED

Place of Birth ...TRINIDAD...

Date of Birth ...20 March 1960...

Holder is accompanied by:

..........................................
..........................................
..........................................

EMERGENCY CERTIFICATE

This is to certify that

Wayne Ricky Elison Rudder

has stated to me that he/she is a citizen of Trinidad and Tobago and that I have no reason to doubt this statement.

This certificate is valid only for the journey to

...TRINIDAD & TOBAGO...

leaving ...U.S.A...

on or about ...November - December 1993...

for ...TRINIDAD... and must be surrendered to the Immigration Officer at the place of arrival.

EMBASSY OF THE REPUBLIC TRINIDAD AND TOBAGO

NOV. 19 1993

WASHINGTON

Gerold Thompson
*Signature of Issuing Authority*
AMBASSADOR

91

308

L-28C-P71    164

# EXHIBIT COVER PAGE

# EXHIBIT 

# EXHIBIT COVER PAGE

# EXHIBIT _____



## EMBASSY OF THE REPUBLIC OF TRINIDAD AND TOBAGO

TEL:  (202) 467-6490
FAX:  (202) 785-3130

1708, MASSACHUSETTS AVENUE, N.
WASHINGTON D.C. 200

CON: 3/8/1

November 22, 1993

Immigration  and Naturalization Service
INS/PHS Evaluation Center
St. Elizabeth's Hospital
2700 Martin Luther King Ave., S.E.
Washington D.C.  20032-2602

RE. Wayne Ricky Elison RUDDER
A34 316 600

Dear Sir/Madam:

The enclosed Emergency Certificate will facilitate travel to Trinidad for the above mentioned deportee.

Kindly notify this Embassy about the travel arrangement for his departure.

Ambassador

Encloures

HB/lr

# EXHIBIT COVER PAGE

# EXHIBIT 

# EXHIBIT COVER PAGE

# EXHIBIT _D_

IV 4316600

# UNITED STATES OF AMERICA
## IMMIGRANT VISA AND ALIEN REGISTRATION

**THE IMMIGRANT** ☐ HAS ☒ HAS NOT BEEN PREVIOUSLY IN THE UNITED STATES

**OF:**

| (Family Name) | (First Name) | (Middle Name) |
|---|---|---|
| RUDDER | Wayne | Ricky Elison |

**I & NS FILE NUMBER, IF KNOWN**

**ACTION BY IMMIGRANT INSPECTOR**

OS IR-2
A-34 316 600

**THE IMMIGRANT NAMED ABOVE ARRIVED IN THE UNITED STATES VIA**

PA 232    3/7/74

*(Name of vessel or flight no. of arrival)*

**INELIGIBILITY FOR VISA WAIVED UNDER SECTION**

☐ 212(e)    ☐ 212(h)
☐ 212(g)    ☐ 212(i)

**SEC. 212(a) (14) LABOR CERTIFICATION**

☐ NOT APPLICABLE
☐ STATUTORILY EXEMPT
☐ ATTACHED
☒ NOT REQUIRED

| MO.-DAY-YR. OF BIRTH | COUNTRY OF BIRTH | OCCUPATION | COUNTRY OF LAST RESIDENCE | MARITAL STATUS | SEX | NATIONALITY |
|---|---|---|---|---|---|---|
| 03/20/60 | Trinidad | Student | Trinidad | ☐ M ☒ S ☐ W ☐ D ☐ SEP | ☒ M ☐ F | Trinidadian |

**FINAL ADDRESS IN THE UNITED STATES**

STREET ADDRESS: 91 Atlantic Street    CITY, STATE AND ZIP CODE, IF AVAILABLE: Stamford, Conn. 06901

**ACTION OF S.I.O.**    **ACTION ON APPEAL**    **U.S.P.H.S.**

EXHIBIT No. 2
JAN
(Date)

This visa is issued under Section 221 of the Immigration and Nationality Act, and upon the basis of the facts stated in the application. Possession of a visa does not entitle the bearer to enter the United States if at the time he seeks to enter he is found to be inadmissible. Upon arrival in the United States, it must be surrendered to a United States Immigration Officer.

AMERICAN Embassy

AT Port of Spain, Trinidad, W.I.

*Allen Cooper*

Vice Consul of the United States of America.

**IMMIGRANT CLASSIFICATION**

**CLASSIFICATION SYMBOL** IR-2

**FOREIGN STATE/OTHER AREA LIMITATION**

**IMMIGRANT VISA NO.**

| **ISSUED ON** | (Day) | (Month) | (Year) |
|---|---|---|---|
| | 4 | March | 1974 |

**THE VALIDITY OF THIS VISA EXPIRES MIDNIGHT AT THE END OF**

| (Day) | (Month) | (Year) |
|---|---|---|
| 3 | July | 1974 |

**PASSPORT**

NO. 314851

**OR OTHER TRAVEL DOCUMENTS (Describe)**

**ISSUED TO** Wayne Ricky Elison RUDDER

**BY** Passport Office Trinidad

**ON** February 18, 1974

**EXPIRES** February 18, 1979

Tariff Item No. 21
Fee Paid $20
Local Cy. Equiv. $40.00

FORM 12-68 FS-511

☆ U. S. GOVERNMENT PRINTING OFFICE

# EXHIBIT COVER PAGE

# EXHIBIT 





R-17-PT/

## COUNTY OF LOS ANGELES•REGISTRAR-RECORDER/COUNTY CLERK

STATE FILE NUMBER

**CERTIFICATE OF LIVE BIRTH**
STATE OF CALIFORNIA — DEPARTMENT OF PUBLIC HEALTH

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER **7055**

**45858**

| | | |
|---|---|---|
| **THIS CHILD** | 1A. NAME OF CHILD—FIRST NAME **Vincent** | 1B. MIDDLE **Daniel** | 1C. LAST NAME **Hopper** |

| 2. SEX **Male** | 3A. THIS BIRTH—SINGLE, TWIN OR TRIPLET **Single** | 3B. IF TWIN OR TRIPLET, THIS CHILD BORN 1ST, 2ND, 3RD | 4A. DATE OF BIRTH—MONTH, DAY, YEAR **August 27, 1960** | 4B. HOUR **8:52 P** M |

| **PLACE OF BIRTH** | 5A. PLACE OF BIRTH—NAME OF HOSPITAL **St. Francis Hospital** | STREET ADDRESS (GIVE STREET OR RURAL ADDRESS OR LOCATION. DO NOT USE P. O. BOX NUMBERS) **3630 Imperial Highway** |
| | 5C. CITY OR TOWN **Lynwood** | COUNTY **Los Angeles** |

| **MOTHER OF CHILD** | 6A. MAIDEN NAME OF MOTHER—FIRST NAME **Julia** | 6B. MIDDLE NAME **Mae** | 6C. LAST NAME **Williamson** | 7. COLOR OR RACE OF MOTHER **Negro** |
| | 8. AGE OF MOTHER (AT TIME OF THIS BIRTH) **26** YEARS | 9. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **Illinois** | 10. MAILING ADDRESS OF MOTHER |

| **USUAL RESIDENCE OF MOTHER** (WHERE DOES MOTHER LIVE?) | 11A. USUAL RESIDENCE OF MOTHER—STREET ADDRESS OR LOCATION **1512 Visalia** | IF INSIDE CORPORATE LIMITS ☑ CHECK HERE | IF OUTSIDE CITY CORPORATE LIMITS CHECK ONE ☐ ON A FARM ☐ NOT ON A FARM |
| | 11C. CITY OR TOWN **Compton** | COUNTY **Los Angeles** | STATE **California** |

| **FATHER OF CHILD** | 12A. NAME OF FATHER—FIRST NAME **James** | 12B. MIDDLE NAME **Wilder** | 12C. LAST NAME **Hopper** | 13. COLOR OR RACE OF FATHER **White** |
| | 14. AGE OF FATHER (AT TIME OF THIS BIRTH) **34** YEARS | 15. BIRTHPLACE (STATE OR FOREIGN COUNTRY) **Illinois** | 16A. PRESENT OR LAST OCCUPATION **Salesman** | 16A. KIND OF INDUSTRY OR BUSINESS **Automotive Equip.** |

| **INFORMANT'S CERTIFICATION** | I HAVE REVIEWED THE ABOVE STATED INFORMATION AND HEREBY CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | 17A. MOTHER OR OTHER INFORMANT (Signature) *Julia M. Hopper* | 17B. DATE SIGNED BY INFORMANT **August 29, 1960** |
| **ATTENDANT'S CERTIFICATION** | I HEREBY CERTIFY THAT I ATTENDED THIS BIRTH AND THAT THE CHILD WAS BORN ALIVE AT THE HOUR, DATE AND PLACE STATED ABOVE. | 18A. ATTENDANT (Signature) *Gilbert J. Hill, M.D.* 18B. ADDRESS *Lynwood Calif* |
| **REGISTRAR'S CERTIFICATION** | 19. DATE ON WHICH NAME ADDED BY SUPPLE-MENTAL NAME REPORT | 20. LOCAL REGISTRAR (Signature) *Ruth Rivers* | 21. DATE RECEIVED BY LOCAL REGISTRAR **SEP 14 1960** |

Filed **OCT 7 1960** | RAY E. LEE, COUNTY RECORDER

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk. **MAR 0 2 2006**

*Conny B. McCormack*
CONNY B. McCORMACK
Registrar-Recorder/County Clerk

This copy not valid unless prepared on engraved border displaying Seal and Signature of the Registrar-Recorder County Clerk.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

\* 19-0010800 \*

